R. H. NORRIS, I. B. GRIFFITH, CARL NORRIS, E. J. WELCH, MRS. E. J. WELCH, R. H. NORRIS, Administrator of the Estate of MRS. R. H. NORRIS, Deceased, A. L. DOUGLAS, and MRS. A. L. DOUGLAS,

` *Plaintiffs and Appellants,*

v.

UNITED MINERAL PRODUCTS COMPANY, a Corporation, PAUL R. PETERSON, BERT LEBRON, also known as RODERICK LEBRON, HARPER POLING, G. H. NELSON, also known as GUS NELSON, W. L. SCOTT, HENRY LANDMER KAMP, also known as HENRY LAUD WEHRKAMP and HENRY LANDWER KAMP, L. C. WRIGHT, RALPH WALLEN, A. A. PATEE, THELMA BERTHELMEH, EVA FIRESTONE, JESSIE WHITE, LEE MEAD, MARION MEAD, MRS. J. M. MEAD, all heirs of J. M. MEAD, Deceased, VICTOR I.

JEEP, also known as VICTOR I. JELP, GEORGE BUTTS, JACK DINWIDDIE, JACK DINWIDDIE, Administrator of the Estate of MAGGIE DINWIDDIE, Deceased, and C. W. MESSERSMITH,

*Defendants and Respondents.*

(No. 2306; May 15th, 1945; 158 Pac. 2d .679)

388

390

For the plaintiffs and appellants the cause was submitted on the brief of Raymond & Guthrie, of Newcastle, Wyoming, and R. G. Diefenderfer, of Sheridan, Wyoming, and oral argument by Mr. E. C. Raymond and Mr. Diefenderfer.

For the defendants and respondents the cause was submitted on the brief and also oral arguments by E. E. Wakeman, of Newcastle, Wyoming, and Otis Reynolds, of Sundance, Wyoming.

392

## OPINION

RINER, Justice.

In this proceeding by direct appeal the appellants, plaintiffs below, question the propriety of a judgment

of the District Court of Weston County, rendered in an action which was commenced in Crook County, and the venue thereof thereafter changed by stipulation of the parties to the County first mentioned. The action was one to quiet title to certain placer mining claims, the mineral sought to be obtained thereby being what is now commonly known as bentonite. See Chittim v. Belle Fourche Bentonite Products Company, 60 Wyo. 235, 149 Pac. 2d 142, 145, 146, for a brief general description of this mineral. Injunctive relief was also sought in the action by the plaintiffs against the defendants, who are now the respondents here, to restrain alleged continuous trespasses on the part of the latter upon ground which plaintiffs claimed as the owners thereof.

The parties who will usually be referred to subsequently as aligned in the District Court appear to agree that the material facts to be considered on appeal are substantially these:

J. Merle Blakeman, on August 31, 1934, filed in the United States Land Office at Buffalo, Wyoming, an application for an Oil and Gas Permit for the lands in controversy in this lawsuit and also other lands all of which were then public mineral lands of the United States. The permit thus applied for was granted by the Department of the Interior, April 9, 1936, and continued in force until it was cancelled on September 9, 1939, by that department of the government.

On March 20, 1936, the defendant, Paul R. Peterson, and others associated with him, undertook to locate the "Muddy No. 1" Bentonite Placer Claim, and, so far as the formal requirements of locating a placer mining claim including discovery of mineral, posting the lands and filing proper notices were concerned, these requirements appear to have been met. The lands included in this claim were: the NW¼NW¼ of Section 28,

W½SW¼ of Section 21, and NE¼SE¼ of Section 20, all in Township 49 North, Range 65 West of the 6th Principal Meridian, in Crook County, Wyoming. On that date also the defendant, Jack Dinwiddie with others undertook to locate the "Dinwiddie" Bentonite Placer Claim on the E½NE¼ of said Section 20, Township 49 North, Range 65 West of the 6th Principal Meridian in said county and they also complied with the formal requirements of making a placer mineral location, as mentioned above, in connection with the "Muddy No. 1" claim. However, we may properly note that it should be kept in mind that these claims thus undertaken to be established were upon lands embraced in the Blakeman Oil and Gas Permit and while it was in full force and effect.

Nevertheless, these two locator groups appeared to have remained in undisturbed possession of their claims aforesaid not abandoning them at all but during each subsequent year taking the necessary legal steps to retain same through performance of the proper amount of annual labor for each claim or establishing due exemption therefrom. It seems that from March 20, 1936, and until September 25, 1939, these parties in fact engaged in removing the bentonite mineral from these claims and selling it.

After the cancellation of the Blakeman Permit on September 9, 1939, as above stated, the defendants still relying on their filings for the "Muddy No. 1" and "Dinwiddie" claims aforesaid, the plaintiffs went upon the ground and located the NW¼NW¼ of said Section 28, the W½SW¼ of said Section 21, the NE¼SE¼ of said Section 20, as the "Skinny No. 1" Bentonite Placer Mining Claim, and the NE¼ of said Section 20 as the "Skinny No. 2" Bentonite Placer Mining Claim. It will be observed that the plaintiffs' "No. 1" claim covered exactly all the ground included in the defend-

ants' "Muddy No. 1" claim already described, while the "Skinny No. 2" and the "Dinwiddie" were in conflict in respect of the $E\frac{1}{2}NE\frac{1}{4}$ of said Section 20. These locations of the plaintiffs' were made September 26, 1939. The following day their location certificates were duly filed in the proper Crook County office. Subsequently affidavits of annual assessment work on plaintiff's two claims for the period ending June 30, 1941, were filed as required by law.

November 2, 1940, and May 31, 1941, the "Muddy No. 1" locators aforesaid undertook to make supplemental and amended locations of that claim. Sundry conveyances from the locators of the "Muddy No. 1" and "Dinwiddie" claims appear to have been made but there is no question that all the parties interested in the ground in controversy were not before the District Court on the trial of the cause either as plaintiffs or defendants.

August 27, 1941, the locators of the two "Skinny" claims above described filed their petition in this lawsuit to quiet title relative to both these claims and prayed judgment against the defendants that "these plaintiffs be declared to be the lawful occupants and owners of the said mining claims as against any and all claims of the defendants and that the defendants be enjoined by this Court from further trespassing upon the said premises, removing bentonite therefrom or in any manner invading the rights and privileges of these plaintiffs or any of them in their peaceable possession of the said premises." Additional relief was also asked that the defendants account for the value of the bentonite removed from the plaintiffs' claims and "that these plaintiffs be confirmed in their ownership and right to the peaceable possession of the said placer mining claims and that they have their costs herein expended." The parties stipulated that the time of the defendants

for answering this pleading should be extended until October 11, 1941.

Dinwiddie and his associates made another location of the "Dinwiddie" placer claim on September 5, 1941, the certificate of location for which was filed for record in Crook County, September 10, 1941. Aside from its recitals as to marking the claim's boundaries the certificate reads:

"KNOW ALL MEN BY THESE PRESENTS: That the undersigned citizens of the United States and the State of Wyoming, have located and claim by right of discovery and location, the Dinwiddie Placer Mining Claim, lying and being in an unorganized mining district, in Crook County, State of Wyoming, covering and embracing the East half of the Northeast Quarter of Section twenty, in Township Forty-nine North of Range Sixty-five West of the 6th P. M., containing 80 acres.

This location is made by the undersigned as an additional location, the undersigned being successors in interest of the locators of Dinwiddie Placer Mining Claim embracing the same lands herein located—made on March 20, 1936 and certificate of location of which was recorded on March 21, 1936 in the office of the county clerk of Crook County, Wyoming in Book II of location certificates at page 302 and without waiving any rights under said location but claiming all the benefits of said original location as well as all of the benefits of an original location of said described land as of this date.

Discovery of valuable minerals, to-wit: Bentonite was made on said claim by the original locators thereof on March 20, 1936 and that further discovery of such valuable minerals as bentonite was and is made within the boundaries of the said claim on this 5th day of September, 1941."

October 8, 1941, the Peterson group of locators also made a placer mining location known as "Muddy Number One" and the certificate of location thereof was duly filed in Crook County on the same date. Omit-

ting recitals as to staking boundaries and posting location notice that certificate states:

"KNOW ALL MEN BY THESE PRESENTS: That the undersigned, pursuant to the mining laws of the United States, and the laws of the State of Wyoming, claim by right of discovery and location, the 'Muddy Number One' Placer Mining Claim, laying and being in an unorganized mining district in Crook County in the State of Wyoming, and covering and embracing the Northeast quarter of the Southeast quarter (NE¼-SE¼) of Section Twenty (20) and the Northwest quarter of the Southwest quarter (NW¼SW¼) of Section Twenty-one (21), in Township Forty-nine (49) North, Range Sixty-five (65) West of the Sixth Principal Meridian, containing eighty acres.

Discovery of a valuable mineral, to-wit, Bentonite, was made upon the said claim, and the said claim located, staked, and a copy hereof posted on the said land on the 8th day of October, A. D., 1941.

This location is made by the undersigned without waiving any rights claimed by them under prior locations heretofore made, and now owned by them."

The same locators made another placer mining location also on October 8, 1941, known as "Muddy Number Two" and the certificate of location thereof was duly filed in Crook County on that date. Omitting the date as to staking boundaries and posting notice this certificate reads:

"KNOW ALL MEN BY THESE PRESENTS: That the undersigned, pursuant to the mining laws of the United States, and the laws of the State of Wyoming, claim by right of discovery and location, the "Muddy Number Two" Placer Mining Claim, laying and being in an unorganized mining district in Crook County, in the State of Wyoming, and covering and embracing the Southwest Quarter of the Southwest quarter (SW¼SW¼) of Section Twenty-one (21) and the Northwest quarter of the Northwest quarter (NW¼-NW¼) of Section Twenty-eight (28) in Township Forty-nine (49) North, Range Sixty-five (65) West of the Sixth Principal Meridian, containing eighty acres.

Discovery of a valuable mineral, to-wit, Bentonite, was made upon the said claim, and the said claim located, staked ,and a copy thereof posted on the said land on the 8th day of October, A. D. 1941.

This location is made by the undersigned without waiving any rights claimed by them under prior locations heretofore made, and now owned by them."

The several answers of the defendants in connection with both the two, "Muddy" and the "Dinwiddie" Placer Mining Claims, were filed on October 8, 1941. The answer of the defendants, Peterson, Lebron, Poling, Nelson, and Jeep, set out ten separate defenses to plaintiffs' petition. We shall briefly summarize those defenses only of these answers which may be particularly considered with the legal questions suggested and argued by the parties on this appeal.

The first defense of the Peterson group of locators last above mentioned was a general denial and, with the exception of the defendant, Peterson, set out a disclaimer of any interest in the NE¼ of Section 20, Township 49 North, Range 65 West of the 6th Principal Meridian in Crook County, Wyoming; their third defense was that after making the mineral location, as above recited, upon the "Skinny Number One" Placer Mining Claim the plaintiffs "wholly failed and neglected to do or perform any assessment work in the amount of One Hundred ($100) Dollars upon or for the said placer mining claim during the year beginning July 1, 1940 and ending July 1, 1941, as required by the laws of the United States, and that by reason of their failure so to do and perform such assessment work, as by law required, said plaintiffs forfeited and lost any and all rights of every nature or kind which they ever at any time had or held in or to the said lands by virtue of their pretended placer mining location thereon"; their tenth defense was that on October 8, 1941, they, in due form, located the land described in the location certifi-

cates above quoted as the "Muddy Number One" and the "Muddy Number Two" Placer Mining Claims. These defendants' answer included also a cross petition which adopted all the matters set out in their answer and asked that title to the property in controversy be quieted in them.

The first defense of the answer of the defendants, Jack Dinwiddie, Maggie Dinwiddie, Paul R. Peterson, and C. W. Messersmith, this answer alleging nine separately stated defenses, was in form a general denial coupled with a disclaimer of any interest in the NE¼ of Section 20, Township 49 North, Range 65 West, 6th Principal Meridian, in Crook County, Wyoming, "save and except that these answering defendants allege that they are the owners of the 'Dinwiddie Placer Mining Claim,' covering and embracing the East half of the Northeast quarter (E½NE¼) of said Section Twenty (20), Township Forty-nine (49) North, Range Sixty-five (65) West; and these defendants alleged that they are entitled to the possession of the said 'Dinwiddie Placer Mining Claim' by reason of the facts hereinafter set out."; their third defense was that after having made the alleged mineral location as hereinbefore described upon the "Skinny Number Two" Placer Mining Claim, the plaintiffs "on and prior to July 1, 1941, wholly abandoned the said pretended placer mining claim, and all rights of any nature and kind therein, in that the plaintiffs wholly failed and neglected to do and perform any assessment work in the amount of One Hundred Dollars upon or for said placer mining claim during the year beginning July 1, 1940 and ending July 1, 1941, as required by the laws of the United States; and that by reason of such failure so to do and perform such assessment work, the plaintiffs forfeited and lost any and all rights, if any, of every nature or kind which they ever at any time had or held in or to the said lands by virtue of their pretended placer min-

ing location thereon''; their seventh defense was "That on or about the 5th day of September, 1941, they discovered the existence of a valuable mineral, namely Bentonite, on the East half of the Northeast quarter (E½NE¼) of Section Twenty (20) Township Forty-nine (49), Range Sixty-five (65), in Crook County, Wyoming. That thereupon they placed a substantial stake near the Southeast corner of the said claim, upon which they fastened and posted a copy of their location notice, and that each corner of the said claim was thereupon marked by a substantial stake set firmly in the ground. That they thereupon, and on or about the 5th day of September, 1941, caused a notice to be filed and recorded in the office of the County Clerk of Crook County, Wyoming, in Book 85 on page 245." This answer also set out a cross petition adopting all the matters pleaded in their fourth defense which alleged the first attempted location of the "Dinwiddie" Placer Mining Claim in March of 1936, as mentioned above, and also the last location of that claim under date of September 5, 1941, as already described, and prayed that title to the E½ of the NE¼ of said Section 20, be quieted as against the claims of the plaintiffs or others claiming through them.

As to both answers all affirmative matter therein and in the cross petitions was put in issue by replies and answers on the part of the plaintiffs, the plaintiffs asserting that their locations were prior in time and right to those of the defendants.

Trial of the cause was to the Court without a jury and a judgment was entered which may be briefly summarized as follows: The Court found that due to the fact that the Blakeman Oil and Gas Permit, mentioned above as applied for August 31, 1934, allowed April 9, 1936, and cancelled September 9, 1939, was outstanding upon the lands in controversy during that period

and consequently these lands "were not subject to location or entry under the mining laws of the United States"; that the Peterson and Dinwiddie locations of March 20, 1936 ,were in consequence of the outstanding Permit aforesaid, void and claimants "obtained no rights" under these claims; that the Griffith locations of the two "Skinny" claims on September 25, 1939, were valid; that the locators of the claims last mentioned were required by the laws of the United States to do at least $100.00 worth of work on each claim from July 1, 1940, to July 1, 1941, but that they did not meet this requirement, the value of all the work done as annual labor on behalf of these two claims during said period being not to exceed the sum of $30.00 and so "the lands embraced in said claims became subject to re-location on and after July 1, 1941"; that while said lands were open to re-location Dinwiddie and associates on September 5, 1941, duly re-located a part of said lands as the "Dinwiddie" Placer Mining Claim and on October 8, 1941, Peterson and associates duly re-located a part of said lands as "Muddy Number One" and "Muddy Number Two" Placer Mining Claims; that upon these last mentioned re-locations being made the rights of Griffith, et al., thereto terminated and the defendants "are now and have been since said relocations entitled to the possession of the lands here in controversy"; that upon all other issues not covered by special findings the finding was "generally in favor of the defendants and against the plaintiffs exception being made as to the fifth defense in each answer which were abandoned by the defendants; that plaintiffs were entitled to the possession of the W½NE¼ of said Section 20, Dinwiddie et al., to the E½NE¼ of that section and Peterson et al., to the NE¼SE¼ of that section, the W½SW¼ of said Section 21, and the NW¼-NW¼ of said Section 28. The judgment was in accord with these findings and so awarded possession of

these lands, injunctions being also granted the parties hereto restraining them from trespassing upon the lands whose possession was not adjudged to them. Exceptions to the findings adverse to the several parties were duly reserved but defendants have not prosecuted any appeal as to the matters ruled against them.

The disposition of this case rests upon the proper solution of several legal questions, viz., whether the locators of the two "Skinny" claims lost their rights thereto by failing to do the annual assessment work thereon required by law and whether the "Dinwiddie" and the two "Muddy" claims as located on September 5, 1941, and October 8, 1941, were valid.

It is first contended on behalf of the plaintiffs that the defendants had no right to make locations of their respective claims after this action was commenced. As a matter of fact in this connection the question thus attempted to be raised and urged is not whether defendants had a right to make the "Dinwiddie" and the two "Muddy" Placer Mining Claim locations but whether they, having made the locations could rely upon them as a defense in the cause at bar. It needs no argument to establish that if the lands on which these placer mining locations of the defendants were made were public mineral lands of the United States open to location and entry and the locators aforesaid were duly qualified to make such locations, then these locators certainly could make such locations. Title 30, U. S. C. A., Section 22, provides:

"Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of

miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States. R. S. §2319; Feb. 25, 1920, c. 85, § 1, 41 Stat. 437."

As to the exception referred to in the statute, see Title 30, U. S. C. A., Section 181, dealing with the leasing of United States government mineral lands. There is no question here as to the qualifications of any of the locators. For the purposes of the question above suggested we shall assume for the present that the lands included in the "Dinwiddie" and "Muddy" claims were public mineral lands of the United States open to location and entry during the months of September and October, 1941, as the trial Court subsequently found.

The action at bar as presented by the pleadings is as plaintiffs state in the opening sentence of their brief "one to quiet title to bentonite placer claims" and injunctive relief is also sought by plaintiffs' petition as already noted. These are both equitable remedies as is well known to the legal profession. So, 51 C. J. 136-137, § 7, says:

"In many jurisdictions statutes have been enacted authorizing actions to be maintained for the determination of adverse claims and to quiet title. Such statutes are enabling acts, and the proceeding thereunder is not usually regarded as a special proceeding, but as an action, equitable in its nature, and governed by the rules pertaining to suits in equity, except where the statute directs otherwise."

44 Am. Jur. 8, § 7, is to the same effect:

"Generally, however, actions under the statutes are regarded as equitable in character; and, except as otherwise provided in the statute, the proceeding is governed by the familiar equity rules, including the rule as to the joinder of parties in order to bind contingent interests."

The Supreme Court of Ohio, in W. C. McBride Inc., v. Murphy, 111 Ohio St. 443, 145 N .E. 855, referring to

§ 11901 of the Ohio General Code, a statute similar to our § 89-3901, W. R. S. 1931, covering an action to quiet title in this jurisdiction, says:

"An action to quiet title, authorized by section 11901, General Code, by one in possession against another claiming an estate in the premises, is equitable in character and has been considered as an action in chancery. See the opinion of Judge Hitchcock in Clark v. Hubbard, 8 Ohio, 382, 385."

Likewise, in Erskine v. Dykes, 158 Kan. 788, 150 Pac. 2d 322, the Kansas Court gives us the following brief discussion of the origin and nature of suits to quiet title in these words:

"It may be observed that suits to quiet title had their origin in equity jurisprudence. In many jurisdictions, as in Kansas, provisions were made for statutory actions to quiet title. Whether such statutory actions entirely supplanted and displaced suits in equity need not be discussed, but that in such statutory actions in this state equitable principles have been applied is beyond question."

Relative to the nature of the remedy by injunction, 28 Am. Jur. 198, § 3, states:

"Injunction is distinctly an equitable remedy, the power to grant which stands forth as a distinct head of equitable jurisprudence and the principal and most important of its issued processes."

Mr. Justice Brewer, in City of Emporia v. Soden, 25 Kan. 588, puts the same principle in this form:

"This was an action of injunction,—an equitable action,—and neither party had a right to a jury. Of course, in such an action questions of fact may arise, and the court has power to submit those questions to a jury, but neither party has a right to a jury. Whether one shall be called or not rests in the discretion of the court."

The section of the Kansas Code of Civ. Proc. (Sec. 237, Comp. L. of Kan. 1879) concerning which the eminent

406

jurist wrote as above is similar to § 89-3501, W. R. S. 1931, relative to injunctions. These are familiar elementary principles of law and additional authorities without number could be readily supplied.

The query is then: can defenses arising or established after an equitable action is brought and before an answer is filed, be used by the defendant in that action in such a pleading in bar thereof? The authorities would appear to answer this question emphatically in the affirmative.

21 C. J. 471, says that "Defenses arising after the filing of the bill should also be interposed by answer"; and under the title heading equity, 30 C. J. S. 750, § 331, reiterates this view in the following amplified language:

"a defendant who answers must set up every ground and circumstance on which he intends to rely as a defense, either entire or partial, including defenses arising after the filing of the bill, and defenses not set up are deemed waived."

It would seem to be objected on behalf of the plaintiffs that the cases cited by the text last mentioned in support of its statement do not sustain it. Our examination of them leads us to think otherwise. For example, one of the cited cases, that of Rucker v. Jackson, 180 Ala. 109, 60 So. 139, was a suit to quiet title and the Court stated that:

"It was also not only proper but necessary, that the title so acquired and relied upon should be stated in the answer. The nature and purpose of the proceeding is such as to require an adjudication of the rights and claims of the parties at the time of the rendition of the decree. Not only is it the general rule of equity practice that matters proper for consideration which have occurred since the filing of the bill may be stated in the answer, but the statute governing the procedure of such causes contemplates that the answer shall contain

a statement of the title relied upon by the defendant from whatsoever source or at whatsoever time acquired."

The effect of this decision has been construed and applied by the Supreme Court of Alabama in the subsequent case of Hale v. Tennessee Coal, Iron & R. Co., 183 Ala. 507, 62 So. 783, where the Court used this language:

"This bill was filed by the appellant against the appellee, and invoked the jurisdiction of equity to determine the title, claim, etc., of respondent, to 12 acres of land in Jefferson County. Code, §§ 5443-5448.

After the respondent had answered propounding its claim (Code, § 5445), it sought to amend, and was so permitted by the court, its answer by adding thereto the description of conveyances (to the respondent) which were executed subsequent to the filing of this bill. The complainant moved the court to strike the amendment to the answer, for that it introduced in assertion or justification of respondent's claim of title conveyances executed subsequent to the filing of the bill.

The office and object of proceedings of this character is to determine the status of right or claim at the time the decree is rendered; and, in consequence, the motion to strike was properly overruled. Rucker v. Jackson, 60 South, 139."

Additionally, interpreting the purport of the Rucker v. Jackson case, supra, 44 Am. Jur. 46, § 62, in the course of that text's discussion of the subject "Quieting Title," remarks that:

"It has been held that title acquired by a defendant subsequent to the institution of the action, but prior to the filing of his answer, may be relied upon by him as a defense."

Another of the cases cited by the text is Wormser v. Metropolitan Street Ry. Co., 184 N. Y. 83, 76 N. E. 1036. There, after suit brought, the plaintiff disposed

of certain rights held by him prior thereto and the defendants advanced this fact as a defense. Holding that this could be done the Court said:

"This defense is available to the respondents notwithstanding the fact that the plaintiff did not sell his privileges until after the beginning of the suit. Matters which arise between the bill and plea may be pleaded in equity. (Turner v. Robinson, 1 Simmons & Stuart, 3) Under the old chancery system in this state there was no rule of equity pleading whereby a defendant was precluded from availing himself of matters arising between the filing of the bill and answer, by way of avoidance or defense. (Lyon v. Brooks, 2 Edw. Ch. 110.) Nor is there any such prohibition under the Code. (See Beebe v. Dowd, 22 Barb. 255, 259.) As was said by the late Mr. Justice Hardin in Mann v. City of Utica (44 How. Pr. 334, 339): 'It is a familiar rule in equity cases which permits courts to take into consideration subsequent events happening after the commencement of the action in equity and determining what relief shall be granted, especially where part of the relief asked for is an injunction from the court to restrain parties.' "

See also 1 C. J. 1150, § 395; 1 C. J. S. 1392, § 125, and voluminous list of cases in Note 18 which is supplemented by cases listed under that note number in the 1944 cumulative pocket part for that volume.

In Antol et al., v. Dayton Malleable Iron Co., Ohio App., 38 N. E. 2d 100, an action for injunctive relief, the Court says that:

"Counsel cite a number of cases but the authority which especially appeals to us is Ohio Jurisprudence, Vol. 21, P. 993, Section 10, and the cases there cited. The citation is to the effect that the extent and nature of the relief granted by the court of equity will be determined by the facts as they exist at the time of the decree and not, as at law, according to those existing at the inception of the litigation."

So in Bell v. Treasurer of Cambridge, 310 Mass. 484, 38 N. E. 2d 660, it is said:

"Events happening since the filing of a bill in equity and which have properly come to the attention of the court may be considered in drafting a final decree in order that the relief granted may be adequate in view of the situation then existing."

It seems also to be urged for plaintiffs as we understand their position that a legal defense "relating to and attempting to established a legal title" cannot be interposed by a defendant in an action equitable in nature. But the first clause of § 89-1015, W. R. S. 1931, declares that:

"The defendant may set forth in his answer as many grounds of defense, counter-claim and set-off as he has, whether they are such as have been heretofore denominated legal or equitable, or both;."

Even in the action of ejectment 19 C. J. 1074 declares upon the authority of many cases:

"As a general rule defendant in ejectment, when not estopped from so doing, may defeat plaintiff's recovery by showing title in himself, and for this purpose may purchase outstanding claims and procure as many conveyances as he deems necessary or sufficient. By the great weight of authority the rule applies, even though the title was acquired by defendant subsequent to the comencement of the action, although in a few of the older cases a contrary view has been expressed."

See also 28 C. J. S. 886-887, § 35; 18 Am. Jur. 54, § 56; McCauley v. Jones, 34 Mont. 375, 86 Pac. 422; Hentig v. Redden, 46 Kan. 231, 26 Pac. 701; Johnson v. Sandlin, 206 Ala. 53, 89 So. 81.

If a new title acquired during the pendency of an ejectment action may be interposed by the defendant as a defense to that action it is difficult to perceive why it may not be done in a suit to quiet title and for injunctive relief where equitable principles control. The law does not look with approval upon a multiplicity of suits and where all matters in controversy between the

parties as to the title or possession of real property may well be concluded in one action that should be done. Indeed, that is the real purport of Section 89-1015, W. R. S. 1931, supra. What advantage would be subserved by trying cases of this character by piecemeal, in separate and individual actions, when defendants, at the time they answer in the litigation, hold a title which will operate ultimately to defeat plaintiff's claim? When this title was acquired does not seem important. If it were obtained after answer filed then the defense could and should be submitted by supplemental pleading, (Section 89-1068, W. R. S. 1931).

The two Colorado cases cited by plaintiffs, Floyd v. Sellars, 7 Colo. App. 498, 44 Pac. 373, and Empire Ranch & Cattle Co. v. McPherin, 26 Colo. App. 225, 142 Pac. 419, we do not regard as of particular assistance here. In the first case above mentioned, when it came before the Supreme Court of Colorado for review, (24 Colo. 484, 52 Pac. 674), it was clearly pointed out that it had been stipulated by the parties that the issue of a title acquired after action brought should be brought into the case by an amendment of the defendants' pleading and so in fact it was an issuable matter to be disposed of by the trial Court. The Court of Appeals held otherwise. The second case presented the situation of a defendant relying upon a void deed obtained after action begun so it was perfectly correct to deny relief on that account. In addition it would not seem that the utterance of the Court in the Floyd case that:

"The condition of the plaintiff's title at the time of the commencement of the action, and the claims of the defendants against the property existing at the same time, presented the only questions to be determined in the case,"

accords with the equitable principles reviewed above. The Court cites no authority in support of its view.

The latest decision on this point in the case at bar which we have found is Lortz, et al. v. Rose, et al., 346 Mo. 1212, 145 S. W. 2d 385. There we find the Supreme Court of Missouri using this, as we think, quite pertinent language:

"The purpose of a suit to quiet title is to determine the existing title. Any and all rights of any litigant in the land in controversy may be determined in one suit. White v. Kentling, Mo. Sup., 134 S. W. 2d 39. A party therefore has the right to rely on title acquired after the commencement of the suit. Barr v. Stone, Mo. Sup., 242 S. W. 661. Consequently, there can be no proper objection to the cross bill filed in this case because it asks the affirmative relief set out. The parties interested in the land in controversy are before the court each asserting a right or interest in the land which is the subject matter of the suit. 'Under such circumstances, where (as here) the court has jurisdiction both of the parties and of the subject matter, it is the uniform tendency of the judiciary, in order to avoid circuity of action and multiplicity of suits, to exercise and retain jurisdiction of the cause or proceeding until the rights of the parties in the subject-matter of the cause or proceeding are fully adjudicated, and until full and complete relief is awarded, according to the rights of the parties as represented by the pleadings.' Jones v. Jones, 325 Mo. 1037, 30 S. W. 2d 49, 55."

Under the authorities examined above and under the views we entertain after a careful study of them we are unable to sustain the contention advanced by plaintiffs relative to this aspect of the case at bar.

It is next insisted for plaintiffs, as we understand the point advanced, that because Peterson and Dinwiddie undertook to make locations upon the ground under controversy March 20, 1936, and on account of the then subsisting Blakeman Oil and Gas Permit, these locations were void and because the bentonite mineral was first found when these claims were attempted to be thus located and bentonite was taken from them by these defendants during the course of several years,

there could be no discovery of this mineral upon which to base the locations of September 5, and October 8, 1941. Plaintiffs propound the query "How can any of the defendants claim that they discovered bentonite on the lands in question" on the dates last mentioned "when they had known it was there since March 20, 1936?" If this contention should be sustained it would appear to be quite impossible for one whose original mining location was void for some reason or other to ever re-locate his claim, notwithstanding no one else desired to develop the mineral resources of the ground and despite the fact that the former locator was fully qualified and complied in every other respect with national and state law in making the re-location. This would hardly seem right and we do not find it so established under the authorities which have come to our notice. On the contrary, our study of the law on this point satisfies us that the contention cannot be upheld.

Morrison's Mining Rights, 16th Ed., p. 27, says on the authority of a number of cases:

"The discoverer in law is not necessarily the original finder but is anyone who, knowing of the existence of the mineral, takes some step toward an appropriation of the land which contains it."

The same text supplements this statement with this additional language at p. 633:

"The opinion everywhere has always been that a relocation perfected the original location if in any respect defective, or, if void, the incident which rendered it void being at the time of relocation gone, it operated as an original location. The case of Stepy v. Stark, 7 Colo. 614, 620, 5 P. 111, 17 M. R. 28, so decides in terms. The doctrine that a relocation could not cure a location originally void is absolutely novel and contrary to all the cases which have approached the point."

36 Am. Jur. 352, § 101, after stating that "It is clear, of course, that the original locator of a claim may re-

locate it" in the following section says, "But it is not indispensable that he himself make the discovery, if a sufficient finding of mineral was made by the former holder of the property. In that event, he may rely upon such former discovery, provided he adopts it as his own and bases his claim upon it." We cannot see that it makes any difference whether the relocation of an earlier claim which was void for some reason is thereafter made by a stranger or by the same person who attempted to make the original location so far as the point under consideration is involved.

1 Snyder on Mines, § 578, p. 522, declares "It is generally well settled, and obviously so, that in making a relocation no exploration or new discovery is necessary, in the absence of a state statute or local regulation;". No state statute of the character suggested by the text last cited has been called to our attention.

Mr. Lindley in his text, 2 Lindley on Mines, (3rd Ed.) 935, § 403, adopts the same view as the text last referred to, saying:

"It is a well-established rule that there can be no valid location of a mining claim without a discovery; but it has been held that it is not necessary that the locator should be the first discoverer of a vein, but it must not only be known to him, but must be adopted and claimed by him, in order to give validity to the location.

So, if the original location was based upon a valid discovery, and the relocator finds the vein exposed within the limits of the claim, this is sufficient upon which to base a relocation."

40 C. J. 785, discussing the same subject and citing many cases uses this language:

"So long as a discovery has been made and the location is based thereon, it is not essential that the locator be the first or original discoverer of the mineral. He may avail himself of a previous discovery which has been abandoned or forfeited, within the limits of his

location, without making a valid new discovery for himself, provided he adopts the previous discovery as his own and bases his location thereon."

In Babcock v. O'Lanagan, 7 Alaska 171, we find it said without limitation that: "It is undisputed that a subsequent locator can adopt the discoveries of a prior locator." And the Supreme Court of Idaho, in Allen v. Laudahn, 59 Idaho 207, 81 Pac. 2d 734, adopts the rule announced in Pitcher v. Jones, 71 Utah 453, 267 Pac. 184, to this effect:

"Nor is it essential that the locator of a mining claim should be the first discoverer of a vein or lode in order to make a valid location, and if it appears that the locator knew at the time of making his location that there had been a discovery of a vein or lode within the limits of his location, he may base his location upon it and thus avoid the necessity of making a discovery for himself."

So far as the point we are considering now is involved what is said by the authorities concerning a vein or lode discovery is quite as applicable to a discovery made on a placer claim.

The case of Kendall v. San Juan Silver Mining Co., 144 U. S. 658, 36 L. Ed. 583, is suggested on behalf of the plaintiffs as applicable here. We do not consider it so. In that case it was indicated how plaintiffs could have retained their rights under a mineral location void because attempted to be established on an existing Indian reservation by filing their location certificates within three months after the reservation had been restored to the public domain. This course of procedure they did not follow but waited several years before taking steps to hold the original attempted location. Meanwhile, another party located the land after such restoration had been accomplished by properly locating the land in controversy. He therefore prevailed in the lawsuit. This decision does not hold as we

understand it that plaintiffs could not have promptly made a relocation of the same ground when it became a part of the public domain and at a time when no other rights had intervened.

In the case at bar the trial Court found and adjudged that after July 1, 1941, the ground in dispute here became "subject to relocation." If that be so, and, for the present we shall regard it as a fact, the first legal locations made after July 1, 1941, would certainly take title to the property. These were the locations of the defendants made on September 5, and October 8, 1941. When the defendants made these locations they know that there had been a discovery of bentonite within the limits of their locations and that the mineral was in the ground included by them. They based their claims upon this fact and it was not necessary to make a new discovery on each of these locations. The authorities quoted above make it clear that they had a right to act thus, as we understand their purport. The underlying idea of requiring the discovery of mineral in connection with the location of a mining claim is, of course, simply to establish that the ground is, as a matter of fact, mineral in character and thus prevent a fraud upon the United States Government by parties endeavoring to acquire title to land not of that description. 18 R. C. L. 1120.

It is also urged on behalf of the plaintiffs that § 70-125 W. R. S. 1931, which reads:

"Upon failure of the owners to do or have done the assessment work required within the time above stated, such claim or claims upon which such work has not been completed, shall thereafter be open to re-location on or after the first day of January of any year after such labor or improvements should have been done, in the same manner and on the same terms as if no location thereof had ever been made; provided, that the original locators, their heirs, assigns or legal repre-

sentatives have not resumed work upon such claim or claims after failure, and before any subsequent location has been made,"

is here applicable. The phrase "within the time above stated" refers to § 70-123, W. R. S. 1931, which provides:

"On all placer claims heretofore or hereafter located in this state not less than one hundred dollars worth of assessment work shall be performed during each calendar year from the first day of January after the date of location."

These statutes must necessarily be construed together. When their legislative history is examined in the light of federal legislation on the same subject it becomes apparent that they cannot affect the case at bar. The material contained in these two sections was adopted by the Wyoming Territorial Legislature in 1888, obviously to harmonize our state law with the Act of Congress then in force on that subject, which provided (21 Stat. at Large p. 61, passed January 22, 1880) :

"That the period within which the work required to be done annually on all unpatented mineral claims shall commence on the first day of January succeeding the date of location of such claim, and this section shall apply to all claims located since the tenth day of May, anno Domini eighteen hundred and seventy-two."

Subsequently by amendment in 1921 the law was changed. Title 30, U. S. C. A. Section 28, (42 Stat. at Large 186) provides so far as this point is concerned:

"On each claim located after the 10th day of May, 1872, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year. * * * and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal represent-

atives, have not resumed work upon the claim after failure and before such location. * * * The period within which the work required to be done annually on all unpatented mineral claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12 o'clock meridian on the 1st day of July succeeding the date of location of such claim."

Comparing these statutes, federal and state, it is evident that, regardless of the fact that the Act of Congress was altered, the Wyoming laws were left unchanged and carried forward through all the various compilations and revisions of our statutes. It is hardly necessary to indicate that in such case the Act of Congress must control the matter. It will be sufficient we think to recall that I Lindley on Mines (3rd Ed.) 544, § 249, says:

"State statutes in reference to mining rights upon the public domain must therefore be construed in subordination to the laws of congress, as they are more in the nature of regulations under these laws than independent legislation."

This legal principle is elementary as it relates to mineral claims on the public domain.

Indeed, it would seem that plaintiffs, themselves, took the view that the federal statute aforesaid replaced the state law on this subject for in their proof of annual labor filed in the office of the County Clerk of Crook County, Wyoming, after supplying a description of the two "Skinny" claims the affidavit continues:

"Affiant further states that for the annual assessment year ending June 30, 1941, the owners thereof, including this affiant has done and performed the required assessment work on said claims in the amount of $100.00 worth of work on each claim as by law required to wit: At least $100.00 worth of work on each claim."

Besides this it is apparent from the pleadings and evi-

dence in the record before us that the issue submitted to the trial Court was whether the annual labor on these claims had been performed during the period between July 1, 1940, and July 1, 1941. On this issue the finding below was, as we have seen, adverse to the plaintiffs. There seems to have been no claim made that that period was not the proper one to be considered in determining whether the annual labor on the claims had been duly performed.

In this connection also we may properly cite our recent decision of Griffith v. Noonan, 58 Wyo. 395, 133 Pac. 2d 375, 377.

Our view is that the trial Court did not err in any of its findings on this phase of the case.

The last contention advanced on behalf of the plaintiffs is that the District Court was wrong in finding that the locators of the "Skinny" mining claims failed to do the required $100.00 worth of work on each of these claims as directed by federal law and as a consequence were forfeited and the ground they embraced became subject to relocation after July 1, 1941.

We have carefully examined the testimony of both parties relative to the question whether the plaintiffs did $100.00 worth of work on each of their claims during the annual labor year of July 1, 1940, to and including June 30, 1941, and find that this testimony is in conflict, both as to the amount of the work done for the plaintiffs and the value thereof. It would only lengthen an already extended opinion to review it and no useful purpose would be served thereby. Under such circumstances the well known rule announced in Chittim v. Belle Fourche Bentonite Products Co., 60 Wyo. 235, 149 Pac. 2d 142, 150, must control the disposition of this point here. In other words, the trial Court's finding must stand relative to this question of fact.

Some of plaintiffs' witnesses who testified concerning this matter of annual labor on these claims seem to entertain the opinion that what was paid for the annual labor performed was the criterion which should control the worth of the work done. In this they were mistaken. The test is what was the actual, reasonable value of the work or improvements placed upon the claims for their development as mineral producing ground or which contributed to their development, though without the boundaries of the claims. As said by 40 C. J. 828, 829, § 267:

"The term 'worth' as here used means that the actual reasonable value of the labor or improvements must be one hundred dollars, and it is not sufficient that the cost or contract price of labor, materials, etc., was that amount, * * * The cost, or amount paid, for labor, materials, etc., is not a criterion as to the value thereof, but it is a circumstance to be considered as bearing on the value of the work or improvements, and claimant's good faith in making the expenditures, and as tending to establish the fact that the work was done."

Morrison's Mining Rights, 16th Ed. p. 121, puts the test in this matter in just one sentence thus:

"The test is what the work was worth, rather than what was paid for it, but what was paid for it goes to prove its value."

We may say that we have been aided materially in the disposition of this cause by the able briefs and arguments of counsel for the parties. We are, however, obliged to reach the conclusion as a result of our study and research in the matter than the judgment of the District Court appealed from was correct, should not be disturbed, and, it is accordingly affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.