FRANCIS J. PARKER,

*Plaintiff and Respondent,*

vs.

BELLE FOURCHE BENTONITE PRODUCTS COMPANY, a corporation; AMERICAN COLLOID COMPANY, a corporation; and JOSEPH A. DUBBS,

*Defendants and Appellants.*

(No. 2377; February 24th, 1948; 189 Pac. 2d. 882)

For the plaintiff and respondent the cause was submitted on the brief of Otis Reynolds of Sundance, Wyoming.

For defendants and appellants the cause was submitted on the brief of Smiley and Clark of Belle Fourche, South Dakota, John T. Heffron of Deadwood, South Dakota, Preston T. McAvoy of Newcastle, Wyoming, Scott, MacLeish and Faulk and Joseph A. Dubbs of Chicago, Illinois.

## OPINION

RINER, Chief Justice.

The appellants, Belle Fourche Bentonite Products Co., a corporation, American Colloid Co., also a corporation, and Joseph A. Dubbs instituted this proceeding by direct appeal against Francis J. Parker, respondent, to obtain review of a judgment of the district court of Crook County hereinafter described. The action was one as between the parties above named brought to quiet the title to certain lands in said county held by them as unpatented mining claims initiated under the mineral land laws of the United States and the State of Wyoming, Parker being the plaintiff and the others named above the defendants therein. The Belle Fourche Bentonite Products Company will usual-

ly hereinafter be referred to as the "Bentonite Company" and the American Colloid Company as the "Colloid Company" when mentioned individually. Collectively these appellants will be referred to as "defendants" as they were aligned in the trial court, and Parker as the "plaintiff". The defendant, Joseph A. Dubbs, conveyed any interest he may have had to the American Colloid Company and hence is merely a nominal party.

All that need be given in order to understand the issues raised by the pleadings in the action which were rather voluminous, as is the entire record in the case, is a general outline of the facts involved as follows:

On August 6, 1935 defendants' predecessors in interest made discoveries of the mineral commonly called "bentonite" and duly located as placer mining claims, Iron Creek No. 3 for Lots 5 and 6, Section 2 and Lots 5 and 6, Section 3, and Iron Creek No. 4 for Lots 7 and 8 in Section 2 and Lots 11 and 12 in Section 3 all in Resurvey Township 56 N., Range 62 W. of the 6th P. M.

On August 24, 1935 defendants' predecessors in interest made discoveries of said mineral and duly located as placer mining claims Iron Creek No. 5 for Lots 1, 2, 7 and 8 in Section 28, and Iron Creek No. 6 for Lots 9, 10 and 11 in Section 33 all in Resurvey Township 57 N., Range 62 W. of the 6th P. M.

On July 2, 1936 the predecessors in interest of defendants made a discovery of said mineral and duly located as a placer mining claim Iron Creek No. 7 for Lots 1, 2, 7 and 8 of said Section 33.

Thereafter the persons mentioned in the preceding paragraph also made discoveries of said mineral on December 6, 1937 and duly located as placer mining claims Northside No. 2 for Lots 10, 15 and 16 of Section 22 and Lot 1 of Section 27, Northside No. 3 for Lots 2,

3 and 4 of said Section 27, Lot 5 of Section 26, and Northside No. 4 for Lot 13 of Section 23, Lot 4 of Section 26, all in Resurvey Township 57 N., Range 62 W. of the 6th P. M.

Subsequently and during the month of April, 1942 the predecessors in interest of the plaintiff made discoveries of bentonite and undertook to locate certain placer mining claims known as the Edsall Jolley Nos. 1 to 7 inclusive, the Edsall Jolley Nos. 9 to 11 inclusive and the Jolley and Edsall No. 1. These last mentioned claims included all the ground embraced in the Iron Creek and Northside claims above described except that included in Northside No. 2 in Section 22 and known as Lots 1, 15 and 16 thereof.

The substantial controversy in the case is whether at the time the Edsall Jolley and Jolley and Edsall placer mining claims were thus attempted to be located by the persons who in interest preceded plaintiff, the ground embraced within the several Iron Creek and Northside claims was open and subject to be taken by the Edsall Jolley and Jolley and Edsall groups of locators. There is no question raised herein as to the citizenship of any of the locators of these conflicting claims.

The trial was to the court without a jury and upon request preferred on the part of the defendants, the court made findings of fact and conclusions of law followed by the judgment of which complaint is now made, awarding the ground embraced in the defendants' claims Iron Creek Nos. 3 and 7 respectively to them but adjudging the ground included in the remaining Iron Creek claims, viz. Nos. 4, 5 and 6 and all of the three Northside claims to the plaintiff.

As before said, the action was one to quiet the title to the mineral lands involved as between the parties

to this controversy. The nature of the action is well characterized thus:

"A possessory action for the recovery of any mining title or for damages to any such title is adjudged by the law of possession between the parties, although the paramount title to the land is in the United States. This leaves the United States entirely out of consideration, and neither party can take advantage of the paramount title of the United States either to sustain his own title or to defeat that of his adversary.

\* \* \* \*

"in other words, the possessory right is the right to explore and work the property under the existing laws and regulations. All controversies as to mining claims before patent must be determined by the law of possession. The ordinary rule of law that the plaintiff must recover on the strength of his own title and not on the weakness of that of his adversary does not apply. The rule in possessory actions is that the better title prevails." Ricketts American Mining Law, pp. 224, 225, (3d Ed. 1931).

See also York vs. James, 62 Wyo. 184, 165 P. 2d 109.

The solution of the controversy above mentioned depends upon a consideration of the following federal and Wyoming statutes as applied to the facts disclosed by the record at bar.

Titl. 30 § 28 U. S. C. A. (R. S. Section 2324; c. 41, 18 Stat. 315; c. 9, Section 2, 21 Stat. 61; c. 84, 42 Stat. 186) provides so far as pertinent here:

"On each claim located after the 10th day of May 1872, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year.

\* \* \* \*

"where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original

locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location.

\* \* \* \*

"The period within which the work required to be done annually on all unpatented mineral claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12 o'clock meridian on the 1st day of July succeeding the date of location of such claim."

Section 57-922 W. C. S. 1945 (W. R. S. 1931, Section 70-122) reads:

"For every placer claim, assessment work, as hereinafter provided, shall be done during each and every calendar year after the first day of January following the date of location. Such assessment work shall consist in manual labor, permanent improvements made on the claim in buildings, roads or ditches made for the benefit of working such claims, or after any manner, so long as the work done accrues to the improvement of the claim, or shows good faith and intention on the part of the owner or owners and their intention to hold possession of said claim."

Its coordinate section, W. C. S. 1945, Section 57-923 (W. R. S. 1931, Section 70-123) requires that:

"On all placer claims heretofore or hereafter located in this state not less than one hundred dollars ($100.00) worth of assessment work shall be performed during each calendar year from the first day of January after the date of location."

Section 57-924 W. C. S. 1945 (W. R. S. 1931 Section 70-124) harmonizes with Section 28 U. S. C. A. above quoted, its language being:

"When two (2) or more placer mining claims lie contiguous and are owned by the same person, persons, company or corporation, the yearly expenditure of labor and improvements required on each of such claims may be made upon any one of such contiguous claims if the owner or owners shall thus prefer."

The consequences of failure to obey the law as hereinbefore set forth as found in W. C. S. 1945, Section 57-925 (W. R. S. 1931, Section 70-125) also agree with the provisions of Section 28 U. S. C. A. supra and are: "Upon failure of the owners to do or have done the assessment work required within the time above stated, such claim or claims upon which such work has not been completed, shall thereafter be open to re-location on or after the first day of January of any year after such labor or improvements should have been done, in the same manner and on the same terms as if no location thereof had ever been made; provided, that the original locators, their heirs, assigns or legal representatives have not resumed work upon such claim or claims after failure, and before any subsequent location has been made."

In Norris vs. United Mineral Products Company, 61 Wyo. 386, 158 Pac. 2d 679 it was pointed out that the date of January 1 mentioned in our state statutes aforesaid must be regarded as changed by the paramount federal law which we have above recited to July 1 succeeding the location date of the claim or claims.

In connection with these statutory provisions may be appropriately kept in mind the well-known views of the learned author of Lindley on Mines (3d Ed., Section 630, pp. 1553-4) regarding work done within the limits of a group of claims in furtherance of a common system of development. This oft-quoted text writer after discussing (1) the requirement of contiguity of claims and (2) community of interest in each claim, states upon the authority of numerous decisions of the courts that:

"(3) The aggregate amount of the expenditure of money or labor on one claim must equal in value that which would be required on all the claims if they were separate or independent.

"The same rule is recognized and followed by the land department in estimating value of the expenditures for patent purposes in cases of group applications.

"(4) The work performed or improvements made must manifestly tend to the development of all the claims in the group. The burden of proof is on the owner to show that the work done or improvement made does, as a matter of fact, tend to the development of the property as a whole, and that such work is a part of the general scheme of improvement.

"Such is the rule applied where work is done outside of the claims for the benefit of an entire group."

Thereafter in the same section upon reliable authority also, he indicates:

"As to whether work done upon one claim for the benefit of a group does so benefit all the claims is a question of fact."

So in Snyder on Mines, 456-7, Section 483, we find it similarly said:

"it must generally be a question of fact for the court or jury, whether the work sought to be applied upon a particular claim is such as is in its nature calculated to, and in fact does, tend to develop that particular claim. The court ought not, unless the facts are such that reasonable men cannot differ concerning them, to say in any particular case that the work done does or does not tend to develop the claim. Of course, there are extremes both ways, when it becomes a question for the court to determine as matter of law, as, for instance, where the claims are at such great distance from each other that it would be impossible for work done upon one to have any tendency toward developing the other. But generally, the matter must be a question of fact. And the tendency of the courts in the best considered cases has been in this direction."

The same author also says in Section 479, p. 442:
"But where all or any of the work or improvements are outside the exterior lines of the claim, it then becomes a question of fact as to whether the claim is developed by means thereof."

Appellants have made it clear in their brief-work that they are familiar with the rule so often referred

to and invoked by this court in its consideration of disputed questions of fact and yet so often overlooked by litigants, that the trial court's findings upon conflicting testimony will not be disturbed here when there is substantial evidence tending to support the judgment. They do not, however, appear to recall that in addition to the rule just mentioned there is also another one equally well established by repeated decisions of this court that where there are, as in the instant case, assignments of error that the judgment of the trial court is "not sustained by sufficient evidence" and "is contrary to law", we:

"must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it."

Dulaney vs. Jensen, 63 Wyo. 313, 181 Pac. 2d 605, and cases cited.

These principles we are bound to apply in any case where the record is such as should require their use. We may say, however, without in any way undertaking to establish a precedent or trench upon the operation of the rules aforesaid, that we have examined carefully the entire record in this case. This was made necessary by reason of certain contentions advanced on behalf of appellants presently to be discussed.

There is no complaint made by any of the parties that there was prejudicial error on the part of the district court in awarding the placer mining claims Iron Creek Nos. 3 and 7 to the defendants, consequently that portion of the judgment before us must be regarded as final.

So far as has been drawn to our attention, there was no substantial assessment work or annual labor of any kind done by the defendants or their predecessors in

interest during the year July 1, 1940 to and including June 30, 1941 on the placer mining claims Iron Creek Nos. 4 and 5 respectively or on the placer mining claims Northside Nos. 2 and 4. Just here it may be noted that there are in the case at bar three groups of claims, viz., Iron Creek Nos. 3 and 4 which may be designated as group No. 1 and Iron Creek Nos. 5, 6 and 7 which we may call group No. 2. These two groups are some distance apart but are located on the southerly side of the Belle Fourche river. The placer mining claims Northside Nos. 2, 3 and 4 which may be referred to as group No. 3 and on the northerly side of that river, are some miles distant from the other two groups.

There arises then the crucial question—did the assessment work or annual labor done during the period above indicated, viz., July 1, 1940 to and including June 30, 1941, on any of these claims in fact benefit to the extent of $100 worth on each, those claims where nothing substantial appears to have been done, viz., Iron Creek Nos. 4 and 5 and Northside Nos. 2 and 4; i. e., is there substantial evidence in the record to support the trial court's judgment that such claims were not benefited by the work done by the defendants on the others though adjoining and contiguous?

There was evidence submitted to the trial court that a certain amount of assessment work or annual labor was done by the defendants on Iron Creek No. 3 in group No. 1 supra, and on Iron Creek Nos. 6 and 7 in group No. 2 and also on the placer mining claim Northside No. 3 in group No. 3. This question is as we have seen, one of fact to be resolved by the trial court. We find abundant substantial evidence in the testimony adduced by the plaintiffs on this point to support the trial court's conclusions on this matter.

The evidence in the case is to the effect that the mining development work on bentonite claims is customar-

ily done by means of so-called stripping pits which are usually made by power vehicles and machinery, though some times by hand, which remove the overburden of earth and other debris resting upon the usable mineral bentonite which is found in comparatively small beds and not in veins in place in the country rock as is frequently the case in deposits of gold ore. Development work and of course annual labor is also accomplished by sinking test pits to determine the depth, character, and extent of the bentonite beds.

On these matters we find plaintiff's witness Larson who testified that he had done stripping work on bentonite claims for about four or five years, stated in response to questions propounded to him on direct examination as follows:

"Q. What would you say, comparatively, in reference to these particular strippings on these claims you testified to as to whether that was a difficult operation?

"A. I would say not; the dirt should move fairly easy.

"Q. There shouldn't be impediments or difficulty?

"A. No.

"Q. Based upon your experience in stripping bentonite claims, does the stripping of one bentonite claim have any benefit to an adjoining claim?

"A. I wouldn't say it would have for the reason as your bentonite changes your formation changes and your bentonite lays in small beds.

"Q. In all your experience in bentonite operations have you ever found where work was done on one claim so as to benefit an adjoining claim of bentonite?

"A. In what way?

"Q. In reference to the bentonite itself?

"A. I couldn't say as I have."

\* \* \* \*

"Q. What is your opinion, based upon your experience, as to whether or not hand pits would have anything to do with developing the claim?

"A. I would say they wouldn't."

On re-direct examination the same witness said:

"Q. Going back to the physical situation that existed upon this ground you examined, the various excavations constituting a part of the bentonite deposits or beds, were any of these bentonite beds or deposits joining each other physically?

"A. Not that I know of.

"Q. None of them?

"A. I say not as far as I know.

"Q. Take into consideration the particular claims in question and the land itself as you viewed it there, and based upon your experience in stripping bentonite ground, state whether or not, as a matter of fact, work on either of the bentonite claims you saw would benefit any of the other bentonite deposits on that ground.

"A. That is right.

"Q. Would they benefit each other?

"A. No.

"Q. Would they be separate and distinct?

"A. Yes, sir.

"Q. Distinct from each other?

"A. That's right.

"Q. Any operations done on the one would not physically benefit the other?

"A. No."

Plaintiff's witness Thorson with about the same experience in the development and extracting of bentonite mineral from the ground as the preceding witness, stated:

"Q. Based upon your experience in bentonite operations, Mr. Thorson, from your examination of the stripping pits you have made there, what is your judgment as to whether or not they would benefit any adjoining claims?

"A. The only value of the stripping would be to uncover bentonite that you were going to mine.

"Q. These particular strippings on Iron Creek 3, 6 and 7, did you find any evidence from your examination of those pits and strippings that the bentonite

work done on that tended to benefit any adjoining claim that might have bentonite.

"A.    From a mining viewpoint I would say no, they would have no benefit."

Plaintiff's witness Hagerman who stated that he had been in the business of stripping bentonite for about ten years testified as follows relative to the point:

"Q.    Now, when you examined these claims were any two of the bentonite beds joining each other?

"A.    All bentonite beds join back under the hills. The bentonite is like a sand, like you take the sand of a lake, so that it is actually back in the hills, but after you get back to the heavy overburden, the bentonite is worthless.

"Q.    Bearing in mind the particular claims you examined, which are in controversy here, based upon your years of experience in stripping of bentonite beds, what would you say as to whether or not the work such as you saw was done on these particular claims benefited or would benefit either of the adjoining bentonite claims?

"A.    No."

Howell, a licensed surveyor and engineer in this state who had been engaged for some twenty-five years preceding the trial of the case, in surveying bentonite claims and doing the engineering work in connection with them, also testified as a witness for the plaintiff:

"Q.    I will ask you, Mr. Howell, from your experience as an engineer, whether stripping and test pits on Iron Creek 6 tended in any way to develop Iron Creek 7?

"A.    Not that I know of.

"Q.    Without repetition, it is your opinion, that test pits and stripping pits on a certain claim do not tend to develop adjoining claims?

"A.    That's right."

In connection with the foregoing factual testimony it is of aid here we think to review the decision of the

Secretary of the Interior in the case of In Re Cassel, 32 L. D. 85. There a group of placer mining claims was involved which contained a deposit or formation of marble so near the surface as to be most advantageously removed by means of quarries, after removal of the comparatively small overburden of soil. The Commissioner of the General Land Office had held that a requested and submitted additional proof upon an application made for patent on these lands by Cassel was insufficient:

"for the stated reason that it is not therein made to appear in what manner the excavation upon claim No. 4 would tend to develop or benefit the other claims of the group, and thereupon held the entry for cancellation, except as to claim No. 4".

In affirming the Commissioner's ruling the Secretary of the Interior said in part:

"Section 2324 of the Revised Statutes prescribes that upon each mining claim located subsequent to May 10, 1872, and until patent issues, there must annually be expended $100 in labor or improvements, and further provides that where a number of 'such claims are held in common, such expenditures may be made upon any one claim.' In the case of Copper Glance Lode (29 L. D. 542, 548), and many earlier cases, the latter provision was recognized as equally applicable to the requirement (Sec. 2325, R. S.) that $500 worth of labor be expended or improvements made upon each claim as a condition precedent to obtaining patent.

"It is now well settled that improvements made upon one or wholly outside of several claims held in common are acceptable in satisfaction of the statutory requirements only where the claims are contiguous and where such improvements tend to facilitate the extraction of the minerals contained in the claims. The situation disclosed in most of the decided cases is that of a shaft sunk upon or tunnel driven from one of the claims, or without the group, to reach the veins or ledges of each at a depth which would render the cost of separate shafts or drifts excessive and sometimes prohibitive;

or of the construction of a flume and the introduction of water, for the purpose of washing placer minerals from each claim. But, whether lode or placer, it must appear that the entire group will integrally profit by the work done upon one or more (or wholly outside) of such claims. The labor or improvements so performed or made must be of such character as to *promote the development* of each claim. (See Smelting Co. v. Kemp, 104 U. S., 636, 655; Jackson v. Roby, 109 U. S., 440, 445.)

"It is manifest that the surface excavation or open cut made upon claim No. 4 of the Kosciusko group does not bring the remaining claims any nearer development than they were prior thereto. The deposit of marble is shown to be superficial—covered by at most but a few feet of soil—and plainly susceptible of removal only by means of quarries. In the very nature of such a form of deposit actual work upon the surface of such a claim is indispensable to the extraction of the mineral which composes the deposit. Neither by shafts, tunnels, flumes, nor any of the methods usual in the development of a group of lode or ordinary placer claims can such superficial formation be practically mined. The quarry opened upon claim No. 4 has no tendency to *facilitate* the extraction of the mineral of its companion claims, but obviously tends to the development of that claim alone; and, as said in Jackson v. Roby, *supra,*—

"'The law does not apply to cases where several claims are held in common, and all the expenditures made are for the development of one of them without reference to the development of the other.'"

The doctrine established in the ruling just above reviewed was later re-affirmed and followed by the Department in American Onyx and Marble Company, 42 L. D. 417. We have been unable to find that it has ever been disapproved.

So far as the sufficiency of the alleged assessment work or annual labor for the period of time here being considered, July 1, 1940 to June 30, 1941, upon the placer mining claims Iron Creek No. 6 and Northside

No. 3 are concerned, as was said in Chittim vs. Belle Fourche Bentonite Products Company, 60 Wyo. 235, 149 Pac. 2d 142:

"The evidence in the case relative to the matter, both as to the amount of the work done by the defendant and the value thereof was in serious conflict. There was, however, substantial evidence to support this finding of the trier of the facts in the case. No useful purpose would be accomplished by detailing the evidence on the point. It would not aid as a precedent and would serve only to unduly lengthen this opinion."

See also Norris vs. United Mineral Products Company, 61 Wyo. 386, 158 Pac. 2d 679 where we followed and quoted ruling in the Chittim case supra. We discover no substantial reason why we should not approve the finding of the trial court on this matter in the case at bar.

It is urged on behalf of appellants that a roadway which leads across the unbridged Belle Fourche river on which defendants did some work and Crook County, through its Board of County Commissioners installed a number of culverts upon representations made by the Bentonite Company officials that a right of way for the road would be obtained but which was only partially secured, should be regarded as sufficient assessment work for the required period for these claims of defendants. As to this point it may be noted that it is undisputed that no branch roads to any of the claims in suit were constructed from this road way. There is also testimony submitted for the plaintiff that these claims due to physical reasons could not very practically be reached even by branch roads from the road aforesaid. At any rate whether the claims were sufficiently benefited both as to amount and worth of what was done by the roadway upon which defendants did certain work is in serious conflict and being a question of fact as the authorities cited above state, we think

the trial court's conclusions thereon may not properly be disturbed. No useful purpose that we can see would be subserved by even a summarized recital of the evidence touching the matter. In view of what has been said above, it follows that at the time plaintiff's predecessors in interest made their locations upon the ground embraced in the placer mining claims Iron Creek Nos. 4, 5 and 6 and Northside Nos. 2, 3 and 4, the ground was open to timely appropriation by the parties who located the Edsall Jolley and Jolley and Edsall placer mining claims and the district court's judgment awarding the ground included therein to the plaintiff should not now be disturbed.

It is contended for the defendants, as in the Chittim case supra, that some of plaintiff's predecessors in interest were so-called "dummy locators", it being asserted that these locators had agreed to convey their interests in the claims in controversy, i. e., the said Edsall Jolley and Jolley and Edsall locations to the individuals Jolley and Edsall without consideration to enable these two parties to obtain more mineral ground than the law permits them to have. However, defendants' pleading states that the time when the agreement aforesaid was made is unknown to them. There is no proof called to our attention which sufficiently shows the point thus urged is meritorious. Regarding this matter, the trial court has found as a fact both that:

"all locators were citizens of the United States, over twenty-one years of age, and by location certificates and otherwise located the above described placer mining claims, and that none of the locators were dummies, but all were bona fide locations."

and that:

"the transfer by deed to Francis J. Parker, the plaintiff, of all the interest of the locators of the Edsall Jolley claims, was valid in every respect and not fraudulent."

Under such circumstances what was said concerning a similar contention submitted in the Chittim case supra, it apropos here. We need not repeat it now other than to recall that we there said:

"The use of 'dummies' in locating mineral claims to obtain more ground than the law allows is a species of fraud upon the government. Fraud must be proven by clear, satisfactory, and convincing evidence. We do not find such a situation presented by this record."

Our examination of the record now before us leads us to the same conclusion as announced in that one.

Criticism is directed by appellants at the trial court's findings of fact and conclusions of law but it must be remembered that all the evidence in the case has been brought before us. Appellants have directed our attention to our former decisions in Hilliard vs. Douglas Oil Fields, 20 Wyo. 201, 122 Pac. 626, 628; Cottonwood Sheep Company vs. Murphy, 48 Wyo. 250, 44 Pac. 2d 1000; Bank of Commerce vs. Williams, 52 Wyo. 1, 69 Pac. 2d 525, 535 and finally Bruch vs. Benedict, 62 Wyo. 213, 165 Pac. 2d 561. Appellants seem not to have correctly interpreted the purport of the decisions in these earlier cases as well as the Bruch case decision last cited. In that case there were not merely unsatisfactory findings and conclusions made by the court, but an entire absence of findings of fact and conclusions of law, due to the refusal of the trial court to make them though the request therefor had been timely made. After referring to the Ohio cases of Grant vs. City Trust and Savings Bank — Ohio App. —, 46 N. E. 2d 453, 457 where that court speaking of Section 11421-2 similar to W. C. S. 1945 Section 3-2423 (W. R. S. 1931, Section 89-1321) said:

"The purpose of section 11421-2 of the General Code is to provide an opportunity for the aggrieved party to prosecute error without resorting to the securing of a bill of exceptions. In this case we have before us the

bill of exceptions and all the evidence introduced in the lower Court. We therefore hold that there was no error committed by the trial Court in this regard. If no bill of exceptions were before us, another question would be presented for consideration and determination." and Bauer vs. Cleveland Ry. Co., 141 Ohio State 197, 47 N. E. 2d 225, 228 where the same section of the Ohio Code was considered and it was held that failure to make findings of fact and conclusions of law if properly requested was reversible error *"unless it appears from the record that the party making the request is not prejudiced by such refusal."* (Italics supplied). In the Bruch case the judgment was affirmed after we had examined all the evidence in the record. We have done exactly that in the case at bar and do not find that defendants have been prejudiced by any inaccuracy in the findings of fact and conclusions of law made by the district court, assuming that there were such.

We may say we have examined also the many cases cited in appellants' brief including the recent case of Schlegel vs. Hough, — Oregon —, 186 Pac. 2d 516 which has come under our notice, but do not find them to be of persuasive force under the situation presented by the record at bar.

Other minor points have been urged. We have given consideration to them all but can not see that they are of such a character as to require a reversal of the judgment of the district court of Crook County herein and that judgment accordingly should be affirmed. An order to that effect will be entered.

*Affirmed.*

KIMBALL, J., and BLUME, J., concur.